UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

MAXIM ENTERPRISES, INC.,                    Case No. 07-20300-BKC-RBR
                                            Chapter 7
    Debtor.
_____/

KENNETH A. WELT, Chapter 7 Trustee,

                                            Adv. Pro. No. _____-BKC-RBR-A
    Plaintiff,
v.

LUCILLE C. WANG,

    Defendant.
_____/

**COMPLAINT TO AVOID AND RECOVER FRAUDULENT
TRANSFERS OF PROPERTY[1]**

    Plaintiff, Kenneth Welt, the duly appointed and acting Chapter 7 Trustee ("Trustee" or "Plaintiff") for the estate of Maxim Enterprises, Inc., hereby sues the defendant, Lucille C. Wang ("Defendant"), pursuant to 11 U.S.C. §§ 544, 548 and 550, and Rule 7001 of the Federal Rules of Bankruptcy Procedure, to avoid and recover fraudulent transfers, and in support thereof, states as follows:

**JURISDICTION AND VENUE**

    1.    This adversary proceeding is brought by Plaintiff to avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548, 550 and *Fla. Stat*. §§ 726.105 and 726.106.

    2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

---

[1] Plaintiff reserves the right to bring additional claims against Defendant and nothing contained herein shall be deemed a waiver of any rights or causes of action that the Trustee or the estate may have against Defendant.

3. This is a core proceeding for which the Court is authorized to hear and determine all matters regarding this case in accordance with 28 U.S.C. § 157(b)(2)(A) and (H).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES AND PROCEDURAL BACKGROUND

5. On September 17, 2007, Maxim Enterprises, Inc. ("Maxim" or the "Debtor") executed an Assignment for the Benefit of Creditors pursuant to Chapter 727, Florida Statutes ("the Assignment").

6. Pursuant to the Assignment, Maxim assigned to Ronald Glass of GlassRatner Advisory Capital Group, LLC ("Assignee") all of Maxim's assets except those assets exempt by law from levy or execution. The Assignment expressly provided that the Assignee shall take possession and preserve all assets of Maxim and administer those assets in accordance with Chapter 727, Florida Statutes.

7. On November 21, 2007 (the "Petition Date"), Maxim filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

8. Kenneth A. Welt is the duly appointed chapter 7 trustee for the Debtor's estate.

9. Defendant is an individual residing in the State of Florida and received the transfer or transfers set forth herein from the Debtor within four years of the filing of the Petition Date.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

10. Maxim is a Florida corporation that was originally incorporated in February, 2002 under the name "Maxim Investments, Inc." The President of Maxim Investments, Inc. was Beverlyn Cooke. In March, 2003, Maxim Investments, Inc. changed its name to "Maxim Enterprises, Inc."

11. From its inception until July 9, 2007, Beverlyn Cooke was the President of Maxim. On July 9, 2007, the President of Maxim was changed to Maxim Enterprises Trust. The Trustee of the Maxim Enterprises Trust was Richard Cooke, the husband of Beverlyn Cooke. At all material times, Richard Cooke controlled Maxim.

12. According to its federal tax returns, Maxim's business was to provide real estate management services with respect to real properties.

13. Maxim's actual operations were very different. Maxim, through its principal, Richard Cooke, would locate properties that were being sold at foreclosure sales, and then make arrangements with investors to put up the funds necessary to buy the properties at the foreclosure sales. The properties acquired at the foreclosure sales would be titled in the names of persons and entities other than Maxim, called "Tier 1 Investors." The properties were later resold at profit to other investors that Richard Cooke would locate, called "Tier 2 Investors." The monies received from the sale to a Tier 2 Investor were used, in part, to pay the Tier 1 Investor its predetermined rate of return.

14. The sale price to the Tier 2 Investors was not based upon any type of market value, but rather, a price in order to pay the Tier 1 Investor a predetermined "rate of return," *i.e*. 7.5% guaranteed "fee" plus 1% per month interest from the time the Tier 1 Investor took title to the property until the property was sold to a Tier 2 Investor.

15. The funds used for the Tier 2 Investor to purchase the properties from a Tier 1 Investor did not come from the Tier 2 Investors. Instead, the funds were obtained by Richard Cooke through investors who invested money in what was called the "Maxim Participation Program." These investors came from a number of different sources.

16. One such group of investors (*i.e.*, the "Sig1 Investors") invested millions into what was called the "Maxim Participation Program" through two funding entities, Iron Mike Enterprises, LLC ("Iron Mike") and Sig1 Corp. ("Sig1") after being solicited by various individuals, including Richard Cooke.

17. Richard Cooke represented to potential investors in the Maxim Participation Program (*i.e.*, the Sig1 Investors) that the money from Tier 1 Investors would be used to purchase "undervalued" real properties at foreclosure sales, and after sale of the properties to the Tier 2 Investors, investment funds from the Sig1 Investors would be used to rehabilitate these properties which would then be resold for profit. From these anticipated profits, the Sig1 Investors were assured that that they would be paid significant returns on their investments, *i.e.* 10% return in only three months time. On an annualized basis, the promised rate of return was unrealistic 40%.

18. In addition to the Sig1 Investors, many other individuals and entities invested in the "Maxim Participation Program", some of them through investments that they made directly into Maxim, and others who made investments through companies that, like Sig1, provided funds to Maxim. Just as he did with the Sig1 Investors, Richard Cooke also promised these other investors unrealistic rates of return of 10% in only three month's time, or 40% on an annualized basis.

19. The Tier 2 Investors Richard Cooke identified were really "straw buyers" and were not legitimate buyers in that the Tier 2 Investors were not using their own funds to purchase the properties from the Tier 1 Investors. Instead, the funds used to pay for the "sale" to the Tier 2 Investors would either come from Maxim, or from various loans provided by lenders that Richard Cooke would fraudulently assist obtaining through a mortgage company, Progress

Mortgage Services, Inc., for which his wife was president. The balance of the purchase price would come from Maxim.

20. While properties were being held by the Tier 1 Investors for resale to the Tier 2 Investors, and for later sale to an ultimate purchaser after title was put into the name of a Tier 2 Investor, Maxim would be responsible for paying the carrying costs on the properties, as well as any amounts necessary to rehabilitate the properties even though Maxim never took title to the properties and did not receive a reasonably equivalent value for the payment of these carrying costs or the amounts necessary to rehabilitate the properties.

21. In exchange for allowing title to the properties to be placed in their individual names, the individual Tier 2 Investors were to receive a payment of $1,000.00 from Maxim per property, and $100 per month until the property was sold despite the fact that the Tier 2 Investors did not use their own funds.

22. As part of the scheme, Richard Cooke also arranged to have companies formed that were used as Tier 2 Investors. By way of example, UPG Trust, Inc. ("UPG") and DSJ Trust, Inc. ("DSJ") are two corporations that Richard Cooke made arrangements to incorporate, and then were used as Tier 2 Investors. Both UPG and DSJ were incorporated by the same attorney who handled the closings for the sales of the properties at issue over a several year period.

23. Richard Cooke solicited and made arrangements to have two individuals become the President and Registered Agents of UPG and DSJ and had Maxim pay those individuals for allowing their names to be used as President of each respective corporation.

24. Unbeknownst to these named officers, however, properties that were acquired as part of the Maxim scheme were placed in the name of UPG and DSJ, and mortgages were placed

on the properties, purportedly signed by each of these individuals. However, neither of these corporate officers ever signed any mortgages or deeds on behalf of UPG or DSJ.

25. Although the UPG and DSJ mortgages contained the signatures of witnesses, and of the notary publics who notarized the recorded documents, several of the notaries either resigned or were compelled to resign as notary publics by the Office of the Governor of the State of Florida based upon complaints that were filed by Ms. Murray.

26. One such former notary public admitted to the Office of the Governor that she would notarize a particular person's signature even if that person did not actually sign the document in her presence. In response to an allegation with the Office of the Governor that she notarized the signature of Ms. Murray even though she did not actually witness Ms. Murray sign a document, another person admitted that she would notarize documents at the behest of her boss (Richard Cooke's daughter) so that she would not be fired.

27. Maxim was not operated as a legitimate business. Instead, it was operated by Richard Cooke and others as a ponzi scheme, which permitted them to fraudulently buy and sell real properties that were never owned by Maxim.

28. The forging of mortgages relating to the properties at issue was another aspect of the fraudulent scheme that Richard Cooke utilized.

29. In addition, Richard Cooke used this scheme to pay for his own personal expenses, and those of his friends and family members. It also permitted Richard Cooke to use real estate closing proceeds to be paid to companies in which he, his family members, and his friends had an interest.

## COUNT I – FRAUDULENT TRANSFERS
## PURSUANT TO SECTION 548(a)(1)(A) OF THE BANKRUPTCY CODE

30. The allegations set forth in paragraphs 1 through 29 are re-alleged with the same force and effect as if restated herein.

31. Exhibit 1 attached hereto sets forth and describes the transfers that Maxim made to Defendant within four years of the Petition Date (the "Transfers").

32. Those Transfers that were made between November 20, 2005 and November 20, 2007 (the "Two Year Transfers") were made by the Debtor within two years prior to the Petition Date.

33. The Two Year Transfers were made by the Debtor to the Defendant with the actual intent to hinder, delay or defraud an entity to which the Debtor was or became, on or after the date such transfers were made, indebted.

**WHEREFORE**, Plaintiff respectfully requests the Court to enter a Judgment:

a. Declaring the Two Year Transfers to have been fraudulent transfers pursuant to § 548(a)(1)(A) of the Bankruptcy Code

b. Avoiding the Two Year Transfers made to Defendant as fraudulent transfers in violation of § 548(a)(1)(A) of the Bankruptcy Code; and

c. Granting such other and further relief as may be just and proper.

## COUNT II – FRAUDULENT TRANSFERS
## PURSUANT TO SECTION 548(a)(1)(B) OF THE BANKRUPTCY CODE

34. The allegations set forth in paragraphs 1 through 29 are re-alleged with the same force and effect as if restated herein.

35. The Two Year Transfers were made by the Debtor within two years prior to the Petition Date.

36.     The Debtor received less than reasonably equivalent value in exchange for the Two Year Transfers, and

   a.     was insolvent on the dates that the transfers were made or was rendered insolvent because of those transfers;

   b.     was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; or

   c.     the Debtor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

**WHEREFORE**, Plaintiff respectfully requests that the Court to enter an Judgment:

   a.     Declaring the above referenced payments to Defendant to have been fraudulent transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code;

   b.     Avoiding the Two Year Transfers made to Defendant as fraudulent transfers in violation of § 548(a)(1)(B) of the Bankruptcy Code; and

   c.     Granting such other and further relief as may be just and proper.

**COUNT III – AVOIDANCE OF FRAUDULENT TRANSFERS
PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE
AND SECTION 726.105(1)(a) OF THE FLORIDA STATUTES**

37.     The allegations set forth in paragraphs 1 through 29 are re-alleged with the same force and effect as if restated herein.

38.     Within the four year period preceding the Petition Date, the Debtor made the Transfers to Defendant.

39.     The Transfers were made by the Debtor with the actual intent to hinder, delay or defraud creditors of the Debtor.

40.     The Transfers may be avoided under 11 U.S.C. § 544 and *Fla. Stat*. §726.105(1)(a).

**WHEREFORE**, Plaintiff respectfully requests this Court to enter a Judgment:

a.      Declaring the above referenced payments to Defendant to have been fraudulent transfers pursuant to *Fla. Stat.* § 726.105(1)(a);

b.      Avoiding the Transfers made to Defendant as fraudulent transfers in violation of *Fla. Stat.* § 726.105(1)(a); and

c.      Granting such other and further relief as may be just and proper.

### COUNT IV – AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE AND SECTION 726.105(1)(b) OF THE FLORIDA STATUTES

41.     The allegations set forth in paragraphs 1 through 29 are re-alleged with the same force and effect as if restated herein.

42.     Within the four year period preceding the Petition Date, the Debtor made the Transfers to Defendant.

43.     The Debtor made the Transfers without receiving reasonably equivalent value in exchange for the Transfers, and

a.      was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to its business or transaction; or

b.      intended to incur, or believed it would incur, debts that would be beyond the Debtor's ability to pay as they became due.

44.     The Transfers may be avoided under 11 U.S.C. § 544 and *Fla. Stat*. §726.105(1)(b).

**WHEREFORE**, Plaintiff respectfully requests the Court to enter a Judgment:

    a.    Declaring the above referenced payments to Defendant to have been fraudulent transfers pursuant to *Fla. Stat.* § 726.105(1)(b);

    b.    Avoiding the Transfers made to Defendant as fraudulent transfers in violation of *Fla. Stat*. § 726.105(1)(b); and

    c.    Granting such other and further relief as may be just and proper.

### COUNT V – AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO SECTION 544 OF THE BANKRUPTCY CODE AND SECTION 726.106(1) OF THE FLORIDA STATUTES

45.    The allegations set forth in paragraphs 1 through 29 are re-alleged with the same force and effect as if restated herein.

46.    Within four year period preceding the Petition Date, the Debtor made the Transfers to Defendant.

47.    The Debtor made the Transfers without receiving reasonably equivalent value in exchange for the Transfers.

48.    The Debtor was insolvent at that times of the Transfers or became insolvent as a result of thereof, and a creditor(s) existed at the time of each of the Transfers.

49.    The Transfers may be avoided under 11 U.S.C. § 544 and *Fla. Stat*. §726.106(1).

**WHEREFORE**, Plaintiff respectfully requests this Court to enter a Judgment:

    a.    Declaring the above referenced payments to the Defendant to have been fraudulent transfers pursuant to *Fla. Stat.* § 726.106(1);

    b.    Avoiding the Transfers made to Defendant as fraudulent transfers in violation of *Fla. Stat*. § 726.106(1); and

    c.    Granting such other and further relief as may be just and proper.

## COUNT VI – RECOVERY OF PROPERTY PURSUANT TO SECTION 550 OF THE BANKRUPTCY CODE

50. The allegations set forth in paragraphs 1 through 49 are re-alleged with the same force and effect as if restated herein.

51. The transfers referenced above are avoidable by Plaintiff pursuant to pursuant to 11 U.S.C. §§ 544 and 548 and as a result, such payments are recoverable by Plaintiff pursuant to 11 U.S.C. § 550.

52. Defendant was the initial transferee of the above referenced payments and/or the entity for whose benefit such transfers were made.

**WHEREFORE**, the Plaintiff respectfully requests that this Honorable Court enter a Judgment:

    a. Declaring Defendant to be the initial transferee and/or the entity for whose benefit the above referenced payments were made;

    b. Directing Defendant to turnover the above referenced fraudulent payments, plus interest at the applicable federal statutory rate, and reasonable attorneys' fees and expenses to the extent permissible by applicable law to Plaintiff; and

      c.      Granting such other and further relief as may be just and proper.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualification to practice in this Court set forth in Local Rule 2090-1(a).

                                                  BERGER SINGERMAN, P.A.
                                                  Attorneys for the Plaintiff

                                 By:   /s/ John D. Eaton
                                           John D. Eaton, Esq.
                                           Fla. Bar No. 861367
                                           Berger Singerman, P.A.
                                           350 East Las Olas Blvd, 10th Floor
                                           Ft. Lauderdale, Florida 33301
                                           Telephone:   (954) 712-5123
                                           Facsimile:    (954) 523-2872
                                           Email:  jeaton@bergersingerman.com

                                                    and

                                           Kristopher E. Aungst, Esq.
                                           Fla. Bar No. 0055348
                                           200 S. Biscayne Blvd., Suite 1000
                                           Miami, FL 33131
                                           Telephone: (305) 755-9500
                                           Facsimile: (305) 714-4340
                                           Email    kaungst@bergersingerman.com

2450093-1

| | |
|---|---|
| | **Maxim Enterprises, Inc.** |
| | **Case No. 07-20300-BKC-RBR** |
| | **United States Bankruptcy Court** <br> **Southern District of Florida** <br> **Fort Lauderdale Division** |

**Maxim Enterprises, Inc.**
**Summary Of Cash Receipts And Cash Disbursements**
**For The Period November 21, 2003 Through November 21, 2007**
**Wang, Lucille C.**

| Bank ID # | Statement Clearing Date | Check Date | Check # / Dep Ref # | Cash Receipts | Cash Disbursements | Net Cash Receipts (Cash Disbursements) |
|---|---|---|---|---|---|---|
| WAC-1334 | 03/23/05 | | | $ 100,000.00 | $ - | |
| WAC-1334 | 04/07/05 | | | - | 30,000.00 | |
| WAC-1334 | 04/13/05 | | | 30,000.00 | - | |
| WAC-1334 | 05/26/05 | 05/26/05 | 45743 | - | 100,000.00 | |
| WAC-1334 | 02/16/06 | | | 10,000.00 | - | |
| WAC-1334 | 05/19/06 | | | 75,000.00 | - | |
| WAC-1334 | 09/12/06 | 09/08/06 | 6037 | - | 6,764.00 | |
| WAC-1334 | 11/27/06 | | | - | 15,000.00 | |
| WAC-1334 | 12/26/06 | | | - | 50,000.00 | |
| WAC-1334 | 02/20/07 | | | - | 35,000.00 | |
| **Total** | | | | **$ 215,000.00** | **$ 236,764.00** | **$ (21,764.00)** |